# Exhibit 3

```
                   UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                                :
                                           Docket #22mag1279 and
 UNITED STATES OF AMERICA,             : #22mag1280

                        Plaintiff,    :

   - against -                        :

 ILYA LICHTENSTEIN AND                : February 8, 2022
 HEATHER R. MORGAN,                      New York, New York
                                      :
                        Defendants.
-------------------------------------:


                       PROCEEDINGS BEFORE
                 THE HONORABLE DEBRA C. FREEMAN
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
                      BY:  MARGARET LYNAUGH, ESQ.
                      One Saint Andrew's Plaza
                      New York, New York 10007


For Defendants:       CAHILL GORDON & REINDEL LLP
                      BY:  ANIRUDH BANSAL, ESQ.
                           SAMSON ENZER, ESQ.
                      22 Old Slip
                      New York, New York 10005
```

```
Transcription Service: Carole Ludwig, Transcription Services
                        155 East Fourth Street, #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1

```
 1                                             3
 2          THE CLERK:  United States versus Ilya
 3   Lichtenstein, 22mag1279, and United States versus
 4   Heather Rhiannon Morgan, 22mag1280.  Counsel, please
 5   state your name for the record.
 6          MS. MARGARET LYNAUGH:  Good afternoon, Your
 7   Honor, AUSA Maggie Lynaugh for the government.  With the
 8   Court's permission, I'd ask that I be permitted to be
 9   joined at counsel table by trial attorney for Main
10   Justice, Jessica Peck, and I'm also joined by Special
11   Agents Christian Czeski (phonetic) and Christopher Wong
12   (phonetic).
13          HONORABLE DEBRA C. FREEMAN (THE COURT):  All
14   right, good afternoon.
15          MR. ANIRUDH BANSAL:  Good afternoon, Your
16   Honor, Anirudh Bansal, Cahill Gordon & Reindel, for the
17   defendants, Ilya Lichtenstein and Heather Morgan.  With
18   me from my firm is Sam Enzer, as well as Mr.
19   Lichtenstein and Ms. Morgan.
20          THE COURT:  Okay.  May I have the date and time
21   of arrest for each of the two defendants, please?
22          MS. LYNAUGH:  Yes, Your Honor, both defendants
23   were arrested this morning, February 8th, at
24   approximately 7 a.m.
25          THE COURT:  I understand from the Pretrial
```

4

1
2   Services Report that defendant Lichtenstein is a, is

3   believed to be a Russian citizen, dual citizen, or

4   Russian citizen where consular notification is required,

5   what's the government's understanding?

6          MS. LYNAUGH:  Yes, Your Honor, it's our

7   understanding that he is a citizen of both the United

8   States and Russia, consular notification has been made.

9          THE COURT:  All right, is it the government's

10  understanding it's required when the defendant is a dual

11  citizen?

12         MS. LYNAUGH:  Yes, Your Honor.

13         THE COURT:  All right, well let me start there,

14  Mr. Lichtenstein, is that pronounced correctly?

15         DEFENDANT LICHTENSTEIN:  Yeah.

16         THE COURT:  Okay.  Assuming you are a citizen

17  of Russia, and even if you are also a citizen of the

18  United States, you can sit, it's all right, it may still

19  be true that you'd be entitled to have your country's

20  consular representatives who are present in this country

21  notified of the fact you've been arrested or detained

22  and they may be able to be of some assistance to you.

23  They may be in touch with you if you're held in custody

24  and they may help you be in touch with family members,

25  they may help you in other ways.

```
1                                                    5
2              Russia is a country where that notification has
3   to be made automatically, whether you ask for it or not,
4   and so it is my understanding from what the government
5   has said that they've made that notification. If you do
6   not hear from someone from the consulate and you wish
7   to, I'll ask that you point that out to counsel and,
8   counsel, I'll ask you to follow up with the government
9   about that.
10             I understand that Ms. Morgan is a US citizen,
11  is that the government's understanding?
12             MS. LYNAUGH:  Yes, Your Honor.
13             THE COURT:  Is that also counsel's
14  understanding?
15             MR. BANSAL:  Yes, Your Honor.
16             THE COURT:  All right.  All right, I'm going to
17  address my remarks to both defendants simultaneously
18  unless I specifically say otherwise. So if I explain
19  that the purpose of this proceeding is to advise you of
20  certain rights that you have, you each have these rights
21  and so on.
22             The purpose is to advise you of your rights, to
23  inform you of the charges that you're each facing, to
24  consider whether counsel should be appointed for your,
25  and to decide the conditions, if any, under which you'll
```

```
 1                                                        6
 2  be released at this time.

 3          With respect to your rights, again, this
 4  applies to both of you, you have the right to remain
 5  silent. You are not required to make any statements.
 6  Even if you have already any statements to the
 7  authorities, you need not make any further statements.
 8  Anything that you do say can be used against you.

 9          You each have the right to be released, either
10  with or without conditions, pending your trial unless I
11  find that there are no conditions that would reasonably
12  assure both your presence in court and the safety of the
13  community.

14          You have the right to be represented by counsel
15  during all court proceedings, including this one, and
16  also during any questioning by the authorities. If you
17  cannot afford counsel, you're entitled to have the Court
18  appoint counsel for you.  I understand you are both here
19  today with retained counsel so I'm just going to tell
20  you that if, at any time, you feel you are unable to
21  continue to afford retained counsel, you may make an
22  application to the Court for appointed counsel.

23          Mr. Czeski?

24          SPECIAL AGENT CZESKI:  Yes, Your Honor.

25          THE COURT:  Can you raise your right hand. I
```

```
1                                                7
2    have two Rule 5(c)(3) affidavits for you, from you, one
3    for each of the defendants, I'll take them one at a
4    time. With respect to defendant Morgan, do you swear the
5    statements in the 5(c)(3) affidavit are true and
6    correct, so help you God, and this is your signature at
7    the end?
8            SPECIAL AGENT CZESKI:  Yes, ma'am, it is.
9            THE COURT:  True and correct and your
10   signature?
11           SPECIAL AGENT CZESKI:  That's correct.
12           THE COURT:  Okay, and let's ask the same
13   questions with respect to the affidavit with respect to
14   Mr. Lichtenstein, do you swear the statements in that
15   affidavit are true and correct, so help you God, and
16   that this is your signature at the end of that
17   affidavit?
18           SPECIAL AGENT CZESKI:  Yes, it is correct and
19   that is my signature.
20           THE COURT:  All right, please have a seat.  All
21   right, Mr. Lichtenstein and Ms. Morgan, you were both
22   arrested on the basis of warrants that issued out of the
23   United States District Court for the District of
24   Columbia. In both cases, in cases for each of you, that
25   is, the charges against you in the District of Columbia
```

1
2  are violations of Title 18 of the United States Code
3  Section 1956(h) which makes it a crime to conspire with
4  others to commit money laundering, and a violation of
5  Title 18 of the United States Code Section 371 which
6  makes it a conspiracy to defraud the United States.
7  Because you have been arrested with respect to a
8  complaint against you in the District of Columbia, you
9  each of the right to a hearing at which the government
10 would have the burden of establishing that there is
11 probable cause to believe that these offenses that
12 you've been charged with have been committed and that
13 you are a person who committed the offenses.  You are
14 also each entitled to a hearing on the question of
15 whether you are actually the person named in the
16 warrant.

17         Counsel, do you need some time?

18         MR. BANSAL:  No, Your Honor, we're good.

19         THE COURT:  I just want to make sure that what
20 I'm saying is heard, so if there's a reason you need to
21 talk first, let me know.

22         The hearing, both the hearing, preliminary
23 hearing and the identity hearing to determine if you are
24 the person named in the warrant, must be held within two
25 weeks if you're in custody but it need only be held

1                                                            9

2   within three weeks if you are not in custody.  You

3   should also understand that if an indictment or a

4   criminal information against you is filed before the

5   date of a preliminary hearing, then you would be

6   entitled only to a hearing on the question of whether

7   you are, in fact, the person named in the warrant that

8   was issued for your arrest.

9           You should also understand that if you decide

10  to enter a plea other than a plea of not guilty, in

11  other words, if you decide to give up your right to a

12  trial then you may choose to proceed with the plea and

13  the sentencing phases of your case in this court,

14  subject to the agreement for the prosecutors here and in

15  the District of Columbia. If the prosecutors do not

16  agree to proceed her or if you plead not guilty, then

17  you must go back to the District of Columbia for all

18  further proceedings.

19          Counsel, have you received a copy of each of

20  the two Rule 5(c)(3) affidavits and the underlying

21  complaints out of the District of Columbia?

22          MR. BANSAL:  Yes, Your Honor.

23          THE COURT:  Have you had a chance to review

24  them each with each of your clients?

25          MR. BANSAL:  Well, Your Honor, we did review

```
 1                                             10
 2   the company affidavit attached to the arrest warrant  --
 3             THE COURT:  I'm sorry, you did review the --
 4             MR. BANSAL:  The affidavit attached to the
 5   complaint.  What they use in the District of Columbia is
 6   they attach a coversheet to an affidavit.
 7             THE COURT:  Right.
 8             MR. BANSAL:  And so we did review that with our
 9   clients. We actually just received the affidavit of
10   identification so I have to say that I think that's Mr.
11   Enzer was reviewing with Ms. Morgan, I'd say we haven't
12   had an opportunity to do that but we can do that
13   literally in two minutes because it's very short.
14             THE COURT:  I will give you an opportunity to
15   do that right now so you can let your clients know what
16   these affidavits are about and what they say about them.
17             MR. BANSAL:  Thanks, Judge.  I'm going to be
18   asking you if your clients are going to waive the
19   identity hearing, so it's important for them to know
20   what the allegations are.
21             THE COURT:  Are you ready?
22             MR. BANSAL:  Ready, Your Honor.
23             THE COURT:  All right, so now have you had the
24   chance to review the Rule 5(c)(3) affidavit and the
25   attachments with your clients?
```

```
 1                                            11

 2           MR. BANSAL:  Yes, Your Honor.

 3           THE COURT:  Do you waive any public reading of

 4  the charges?

 5           MR. BANSAL:  Yes, Your Honor.

 6           THE COURT:  By the way, is this a first

 7  appearance in court on these charges, there was never an

 8  appearance before in DC?

 9           MR. BANSAL:  That's correct, Your Honor.

10           THE COURT:  So there was never a bail set there

11  or anything of that nature?

12           MR. BANSAL:  No, Your Honor.

13           THE COURT:  All right.  What is the

14  government's position here with respect to bail?

15           MS. LYNAUGH:  We're seeking detention, Your

16  Honor, with respect to both defendants.

17           THE COURT:  Is there going to be argument from

18  the defendants?

19           MR. BANSAL:  Yes, Your Honor.

20           THE COURT:  From both?

21           MR. BANSAL:  For both, Your Honor.

22           THE COURT:  All right, let me hear from the

23  government first then as to why you think detention is

24  appropriate?

25           MS. LYNAUGH:  Yes, Your Honor, we're seeking
```

12

1

2   detention on the basis of risk of flight.  To start,

3   looking at the complaint, this is obviously a very

4   complicated case.  That said, despite the complexity,

5   there are some things that are extremely clear.  First,

6   the case against both defendants, Lichtenstein and

7   Morgan is extremely strong.  The charges here stem from

8   the 2016 hacking theft of over 119,000 bitcoin from one

9   of the world's largest currency exchanges. At the time

10  of the hack, the stolen funds were valued at

11  approximately $71 million.  Due to the increase in value

12  of bitcoin since then, the stolen funds are now valued

13  at over $5 billion.

14          Although the defendants used numerous

15  sophisticated money laundering techniques, agents were

16  able to trace stolen funds to more than a dozen virtual

17  currency exchange accounts and bank accounts controlled

18  by the two defendants.  Indeed, a search warrant

19  executed on one of Lichtenstein's electronic storage

20  accounts revealed encrypted files containing the private

21  keys needed to control a virtual currency wallet

22  containing over 94,000 bitcoin valued at over $3.6

23  billion.  That currency was directly linked to the 2016

24  hack. The search warrant also revealed documents in one

25  of Lichtenstein's electronic storage accounts containing

1                                                          13
2  login information and the status of various accounts,
3  whether they had been frozen or emptied at numerous
4  virtual currency exchanges, many of which received some
5  of the stolen bitcoin.

6           In short, stolen funds have been traced to bank
7  accounts and virtual currency accounts controlled by
8  Lichtenstein and Morgan.  Bitcoin is not like cash,
9  right, with complex analysis you can determine where it
10  comes from, and in this case agents worked hard and
11  determined that Lichtenstein and Morgan are holding in
12  their accounts significant amounts of bitcoin coming
13  from the 2016 hack.

14           Second, this case is extremely serious.  Based
15  on the amount at issue here alone, the 70, you can take
16  it as 71 million in bitcoin that was originally stolen
17  or you can take it as the now $5 billion at which it's
18  valued, Lichtenstein and Morgan's sentencing guidelines
19  range maxes out over the 20 year statutory maximum for
20  violations of 18 USC 1956.

21           Third, the defendants have the means and,
22  frankly, appear to have the intent to flee. It's worth
23  emphasizing that over 7,500 bitcoin worth approximately
24  $330 million have not yet been identified and seized by
25  the government. That's remaining bitcoin from the 2016

1                                                        14

2    hack, that's bitcoin that hasn't yet been found.  That

3    means the defendants still have access to $330 million

4    to effectuate flight.

5          In conducting their scheme the defendants used

6    and, therefore, have shown they have access to false

7    identity documents.  False identities were used to open

8    many of the accounts that received stolen bitcoin and

9    when agents executed a search warrant on Lichtenstein's

10   electronic storage accounts, they discovered a folder

11   named personas.  The folder contained biographical

12   information and identification documents for numerous

13   individuals.  Agents also found a text file, kind of

14   like a Word file but a text document that included links

15   to different dark net vendor accounts that appeared to

16   be offering passports or identification cards for sale,

17   that file was called "passport_ideas."

18         Additionally, when agents executed a search of

19   Lichtenstein and Morgan's residence in New York in

20   January, they recovered approximately 50 electronic

21   devices, including phones recovered within a bag under

22   their bed labeled "burner phones."  They also recovered

23   more than $40,000 in cash.

24         For -- both Lichtenstein and Morgan have

25   significant foreign ties. Lichtenstein was born in

1

2  Russia and has an active Russian passport. He does not

3  appear to have family based in New York or in DC.  He

4  and Morgan have traveled to over a dozen countries over

5  approximately the last ten years and they've been to the

6  Ukraine as recently as September, 2019.  He's self-

7  employed so he has no deep employment ties to the United

8  States and, in fact, his companies were used by

9  defendants in furtherance of their money laundering

10 schemes.

11        Morgan, defendant Morgan's foreign ties are

12 similarly apparent.  She's married to Lichtenstein, a

13 dual Russian/US citizen since 2019, and the couple has

14 been together since 2015.  From 2011 to 2013, Morgan

15 lived in Hong Kong and Egypt. Her company, which has

16 also been used in furtherance of the money laundering

17 scheme, is incorporated in Hong Kong.  Ms. Morgan has

18 also made clear on her social media that she has been

19 studying Russian, Russian language that is, and she is

20 also apparently fluent in Korean.  So the two defendants

21 have every motive to flee and the financial means to do

22 it based on the bitcoin that's still out there, and it

23 appears even the attempt to make it happen based on the

24 electronic files found in Mr. Lichtenstein's possession,

25 especially the document labeled passport ideas.

1                                                          16

2              Under those circumstances, we believe detention

3    is the only option sufficient to insure the appearance

4    of the defendants.

5              THE COURT:  Is there evidence that the

6    defendants have used aliases?

7              MS. LYNAUGH:  Yes, Your Honor, they used, they

8    used false identities to open a number of the different

9    accounts into which bitcoin was deposited.

10             THE COURT:  Counsel?

11             MR. BANSAL:  Thank you, Your Honor.  Your

12   Honor, Mr. Lichtenstein, I'll start with him, is a 34

13   year old United States citizen. He has lived in the

14   United States with his family since the age of six when

15   they immigrated from the USSR to flee religious

16   persecution, and that fact fairly neutralizes the

17   relevance of the fact that he may still have a Russian

18   passport. There is no chance of him returning there and

19   it is, it's his ethnicity and it seems to be

20   unremarkable that his wife would be learning Russian in

21   that context.

22             Mr. Lichtenstein grew up in the suburbs of

23   Chicago, not Russia.  His father is an employee of the

24   Housing Authority of Cook County, his mother is a

25   biochemist at Northwestern University.  He has no

17

1

2 criminal record, no arrests, and absolutely no

3 convictions.  He's been an entrepreneur of various

4 startups, he's employed dozens of people over the years,

5 most recently he has been involved in Angel Investing,

6 in another startup, and he has been married to Ms.

7 Morgan for three years and together for seven years and

8 they have been planning a family through IVF, and I'll

9 get to why that is the case before all this.

10        Ms. Morgan is 31 years old, she grew up in

11 California, she was born in Oregon. She is a journalist,

12 she is an economist, she's also an entrepreneur and she

13 travels internationally for her work.  She is the CEO

14 and main founder of a sales consulting company that

15 applies 30 freelance writers at any given time.  Her

16 father served in the United States Marine Corps and the

17 United States Airforce and he has been, he's retired

18 from a job as a biologist with the US government

19 agencies.  Mother is, her mother is a high school

20 librarian.  And, of course, as the Pretrial Report

21 confirms, she has no criminal record.

22        Ms. Morgan has just gotten over surgery to

23 remove a fibroid from her breast. She is scheduled to

24 have a follow-up visit next week, she has a number of

25 other medical issues including MERS, which MERS damaged

                                                                18

1

2      her lungs, she has asthma. All of this puts her at an

3      enhanced risk for Covid.  She has endometriosis which is

4      the reason, in part, for the IVF, and she was supposed

5      to be in an oral surgeon tomorrow to repair damage,

6      today, excuse me, to repair damage to her lower lip

7      sustained as a result of a botched procedure, oral

8      surgery procedure. She also has migraines and she can

9      lose her vision if she is under fluorescent lights for

10     too long.  She did have to visit the hospital today.

11             Now I had told the government, and I say, I'm

12     not speaking about the Southern District US Attorney's

13     office, I was speaking to the folks at Main Justice in

14     DC, I had told the government about Ms. Morgan's surgery

15     and had been engaged in active discussions with them

16     about their investigation since January, since early

17     January, and so I was very surprised to learn about her

18     arrest and Mr. Lichtenstein's arrest this morning.  I

19     was even more surprised to hear, and I understand this

20     is a position coming from the Justice Department, not

21     necessarily from the office, but I was even more

22     surprised to hear that the government would be seeking

23     detention under these circumstances.

24             Considering that the clients, these, my clients

25     have been fully aware of the government's investigation

19

1

2  for months now and they have done nothing, Your Honor,

3  but engage counsel and sit tight. They were informed of

4  this investigation in November of last year by a service

5  provider who had received a grand jury subpoena and

6  still they sat tight. And then on January 6th, agents,

7  I'm not sure if they were the same agents, but agents

8  sent by these prosecutors served a search warrant at

9  their apartment, not five minutes from here, and they

10  seized all their computers, all of their phones, their

11  electronic media and still they just sat tight. That's

12  where the evidence comes from and much of it from where,

13  that the government is citing today and that was all

14  seized and still they sat tight, excuse me, Judge. And a

15  storage locker was searched a couple of days later or

16  maybe a day later and, again, still they did nothing,

17  Your Honor, except engage counsel.

18          Now since we've been retained, Judge, as I

19  mentioned, we've been engaged in active discussions with

20  the government about their investigation and they told

21  us fairly early on that they suspected that our clients

22  were involved in money laundering involving the hack of

23  this exchange involving, and they said millions and

24  millions of dollars.  And you can assume, Judge, that we

25  faithfully conveyed our discussions with the government

1                                                           20

2   to our clients and still, Judge, they stayed put. They

3   were in their home minutes from the courthouse and the

4   government had no issue with it because they left them

5   there.

6           So what changed, Judge?  After months of

7   knowing about this matter, what's changed that somehow

8   suddenly makes our clients a flight risk?  Well the

9   government says that, well, they found billions of

10  dollars, they seized billions of dollars worth of

11  bitcoin but I don't think you'll hear that they view

12  this as a billion dollar money laundering case, I don't

13  think I saw evidence in the affidavit that billions of

14  dollars had been laundered.  Regardless, that money is

15  seized, that money has nothing to do with the risk of

16  flight presented by these defendants.  Neither they, nor

17  anybody else besides the Treasury, has access to it at

18  this point.

19          The government says that there is money

20  missing, you know, hundreds of millions of dollars they

21  say is unaccounted for, I didn't hear one word, I don't

22  see one word in the affidavit that connects our clients

23  to that hundreds of millions of dollars or suggests that

24  they have any access to it.  That's speculation, that's

25  just, that's speculation upon which the government is

1

2  suggesting that these clients have access to hundreds of

3  millions of dollars which, if that were true, that would

4  be a circumstance that is not new that has existed since

5  my clients knew about the investigation and, as I said,

6  Judge, they have done nothing.

7        The government brings up identity documents and

8  they say that this is proof of access to false

9  identities. These are photographs, Judge, and the

10  government has a theory about how they fit into the

11  money laundering scheme, I'm sure, but they're

12  photographs. They cannot be used, there is no way in

13  which they could be used to track, and I haven't heard

14  otherwise from the government.

15        And so particularly, Judge, when you consider

16  that none of this is a changed circumstance from when

17  the government has informed our clients about the

18  investigation through a search warrant, when they found

19  out about it from a service provider, it's just not

20  credible for them to suggest that anything material or

21  relevant to bail analysis has changed since a month ago

22  when the government felt completely comfortable leaving

23  our clients at their home, again, minutes from here

24  which is where they stayed and where they will stay and,

25  Judge, I would respectfully submit where they should

1

2 stay.

3          Now this is true for both Mr. Lichtenstein and

4 Ms. Morgan, but I was surprised to hear the prosecutor

5 say that the proof is strong because if you look at the

6 proof against Ms. Morgan, it's essentially nonexistent

7 when it comes to these charges if you look at what the

8 affidavit says. The government says essentially that Ms.

9 Morgan in accounts that are associated with her,

10 received funds that they claim are traceable to the SUA

11 (indiscernible).  Which, by the way, receiving is not

12 conducting a financial transaction, which is what the

13 money laundering statute staid. But that aside, these

14 transfers into Ms. Morgan's accounts were several

15 levels, and the affidavit makes it clear, several levels

16 removed from the actual SUA. There is no direct

17 connection between her and the SUA that would suggest

18 some knowledge that this was illicit money. There are no

19 communications --

20          THE COURT:  What is SUA?

21          MR. BANSAL:  Sorry, Judge, specified unlawful

22 activity --

23          THE COURT:  Oh, all right.

24          MR. BANSAL:  Yeah, I apologize, Judge.

25          THE COURT:  All right, I'd call it specified

23

1

2  unlawful activity.

3         MR. BANSAL:  Will do, Judge.  So, as I said, no

4  communications, no statements, no evidence of any sort

5  that she knew what the government is saying which is

6  these were traceable to some illegal activity. You know,

7  the government says in conclusory terms in the affidavit

8  that, well, there were misrepresentations that Ms.

9  Morgan made in response to KYC questions, know your

10  customer questions that were asked by some of the

11  exchanges that her account were located at, but if you

12  look at the actual allegations, Judge, all the

13  government is saying is that they, in their

14  investigation, could not substantiate the accuracy of

15  the statements that Ms. Morgan made.  So, for example,

16  in paragraph 32 of the affidavit, the government says,

17  well, Ms. Morgan said SalesFolk accepts bitcoin, that's

18  her company, SalesFolk, accepts bitcoin, and the

19  government says, well, we were unable to corroborate

20  that so she must be lying.

21         Paragraph 37(D), the government says that,

22  well, Ms., Ms. Morgan said Mr. Lichtenstein gave her

23  bitcoin over several years and in a conclusory fashion,

24  the government, again, characterizes that as a lie

25  without even addressing whether that's true which, by

1
2  the way, Judge, it is true.  Paragraph 37(F), again the

3  government says, well, Ms. Morgan says SalesFolk takes

4  virtual currency and they say, well, they actually say

5  in this paragraph, well this is possible, but we don't

6  see any evidence of that.  Well they never asked me,

7  Judge, for evidence of that, because I've been in

8  discussions with them for, again, about a month, and

9  then this happens without them even taking the time to

10 figure out whether these statements were, in fact, true

11 or false, they just rushed to judgment. And

12 fundamentally, Judge, it cannot be that if the

13 government cannot prove whether Ms. Morgan's KYC

14 statements were true or false, they get to call it a

15 lie, they have the burden of proof, she does not. And

16 the fact that they can't meet their burden of proof

17 should be held against them, not against Ms. Morgan.

18        And also, Judge, completely missing, that's

19 knowledge, knowledge aside, completely missing from this

20 affidavit is any allegation of intent to conceal.

21 Right, the money laundering statute requires 1956 which

22 they have charged and intent to conceal the nature,

23 source, location, ownership, control, et cetera, of the

24 proceeds. There is no allegation that would support the

25 inference that Ms. Morgan had any intent to conceal

1                                                            25

2   these funds. These are accounts that are in her name,

3   there is no effort to hide them, no effort to suggest

4   that she was trying to conceal anything.  Judge, in

5   fact, the complaint is so thin with respect to Ms.

6   Morgan that if we were in the District of Columbia, if I

7   had any notice that this was going to happen today and

8   if my clients were permitted to voluntary appear in the

9   District of Columbia rather than being taken out of

10  their apartment at 6 or 7 in the morning, I would have

11  looked to dismiss the charges against Ms. Morgan, and I

12  think I would have been successful.  And so it's

13  completely unfair, Judge, to have her held in while we

14  make that application in the District of Columbia where,

15  again, my client should have been given the opportunity

16  to voluntarily appear where they could contest these

17  charges.

18          You know, Judge, on the subject of proof, I

19  don't want to focus exclusively on Ms. Morgan, you know,

20  I was surprised again to hear that this is considered to

21  be a strong case and I do think that, you know, some

22  glossy sort of flowcharts and 20 page affidavit could

23  mask the fact that if you look more closely what you

24  really see, Judge, are a lot of conclusory allegations.

25          So, for example, the government references the

1

2  term chain hopping.  Chain hopping, Judge, and they call

3  that a money laundering technique, that is exchanging

4  one form of virtual currency for another. So if I

5  exchange dollars to pounds, that would be analogous to

6  chain hopping, and there is nothing that is particular

7  nefarious about that though they tried to cast it that

8  way.

9          Peel chain technique, right, that's not a

10  technique, again, when you have cryptocurrency in a

11  wallet and you spend some of it, the rest of it has to

12  be transferred out.  And that's the transfer that

13  they're talking about as a money laundering technique,

14  but that happens every time you don't spend the entire

15  amount that's in a virtual currency account.

16          So I also just noticed that, you know, they

17  call Monero, which is a legitimate form of virtual

18  currency, they just call that an indicator of money

19  laundering and they say, well, one of these accounts,

20  therefore, must be traceable to the, to the hack. And

21  those kinds of conclusory statements, those kinds of

22  attempts to cast what really are innocuous facts as

23  nefarious are, are just riddled through this affidavit.

24  And so if you look at it more closely, I don't think

25  this is a strong case. I certainly don't agree with the

1                                                                    27

2   government's guideline calculations, I don't think that

3   this case maxes out under any circumstances, it's not a

4   billion dollar money laundering case, they're not saying

5   otherwise. There's no way in my view that it maxes out

6   the guideline analysis.

7            Now, travel was mentioned, Judge, I just want

8   to make sure I don't miss this.  I think the best the

9   government could come up with is that they've traveled,

10  or maybe Mr. Lichtenstein has traveled to a dozen

11  countries in the last ten years.  I actually think,

12  Judge, that I, I have him beat on that.

13           THE COURT:  I'm sorry, you what?

14           MR. BANSAL:  I think I've traveled to more

15  countries in the last ten years. I mean I don't think

16  that makes someone a flight risk.  Again, he has, he's a

17  US citizen, they've got his passport, there is no way

18  for him to travel and he's shown no intention to despite

19  knowing all about this investigation.

20           Judge, the prosecutor mentioned that this is a

21  complicated case, I agree with that.  And it will be

22  important as we go through this, the statement of facts,

23  the allegations in there, as well as the allegations

24  that I expect the government is going to have as they

25  move forward, it will be really important to unravel all

28

1

2  of these complicated facts for the government and

3  ultimately to be able to defend them in Court if we have

4  to. And I don't think it's saying anything controversial

5  to suggest that our defense would be seriously hamstrung

6  if Mr. Lichtenstein and/or Ms. Morgan were held in,

7  could be somewhere in the DC area, but if they were held

8  in anywhere it would be very, very damaging to our

9  ability to defend them.  And it would be, this is a case

10 that's complicated enough that the time between now and

11 trial, it could be several months to a year, and it's

12 just not fair with this level of proof, with this track

13 record that the defendants have of staying here despite

14 having known about this investigation for months to

15 subject them and to subject their ability to defend

16 themselves to that.

17         THE COURT:  Well you do realize I'm not making

18 a determination today as to whether they're in custody

19 all the way up until the time of their trial, because

20 the only issue before me is whether they should be in

21 custody so as to be transported to DC or they should

22 report on their own to DC, once they're there the judge

23 there will make a separate determination as to whether

24 they should be in custody from that point forward.

25         MR. BANSAL:  I do understand that, Judge, it's

29

1

2 just that, as you know, these things have a way of

3 becoming precedent and that the government --

4         THE COURT:  Not necessarily. I mean every judge

5 will look at it independently, so possibly yes, but not

6 necessarily so.

7         MR. BANSAL:  I agree with that, Judge, it is

8 possible that the judge down there would, but

9 regardless, Judge, they're, they're in New York, it's a

10 train ride, there is no reason for them not to want to

11 appear and contest the charges. I told you that we are

12 going to do that. There's no reason that the

13 circumstances under which they've been living couldn't

14 be continued and if it's necessary there could be some

15 restrictions imposed such as, you know, we have two

16 financially responsible cosigners lined up for each of

17 them, they'd be willing to subject themselves to

18 electronic monitoring and, if absolutely necessary, to

19 home detention pending trial. But, again, especially

20 with Ms. Morgan, her health conditions considered, being

21 considered, and the fact that there is so much Covid in

22 the prison, that would pose a real risk to her and that

23 for that reason, especially with respect to her, it just

24 would not be fair in keeping with the Bail Reform Act to

25 hold her in, even to go down to DC.

                                                              30

1

2          I would note, Judge, before I close, that I

3   mentioned the cosigners and I did speech about Ms.

4   Morgan's and Mr. Lichtenstein's parents.  Ms. Morgan's

5   parents are here in court and, obviously, they'd be

6   willing to sign that bond.

7          THE COURT:  All right, let me hear from the

8   government on some these points.  Something of note,

9   which I think should be addressed by the government is

10  if these defendants were well aware of this

11  investigation, had been subject to having their home or

12  other properties searched, knew there was an

13  investigation going on and yet did not flee for some

14  period of time, the idea that today, tomorrow or until

15  they can get down to DC they're going to flee, why does

16  the government think the circumstances changed?

17         MS. LYNAUGH:  Absolutely, Your Honor.  Defense

18  counsel says that none of this is a change circumstance,

19  but that's exactly what it is.  Because what happened in

20  late January and early February of this year is that the

21  government managed to decrypt some of the files that

22  they obtained via the search warrant executed at

23  Lichtenstein and Morgan's residence. And when they

24  decrypted that file they found, those files, they found

25  the passkey to an account containing $3.6 billion worth

```
 1
 2  of bitcoin making it abundantly clear that Lichtenstein
 3  and Morgan were, you know, had access to vast amounts of
 4  money and that that money flows from the, directly from
 5  the 2016 hack.  That changed everything.
 6         So to say --
 7         THE COURT:  If they knew that you had searched
 8  and they knew that you were finding whatever you could
 9  find, and they knew the government has a lot of tools at
10  its disposal to uncover whatever it was that it was
11  searching and looking for, then at that point why would
12  they not have the access they had to funds and so on?
13  Why would they not have taken steps at that point to
14  flee?
15         MS. LYNAUGH:  So they knew that the search had
16  been conducted but to say that these files are
17  encrypted, this is not, you know, my understanding is
18  what was used was not just you or I putting a passcode
19  on a file, this was sophisticated encryption technology
20  that was used to encrypt these files. So it's entirely
21  possible Lichtenstein and Morgan thought the government
22  would not be able to get into these materials and there
23  was no indication to them that the government had.
24         Additionally, Your Honor, you know, if they did
25  intend to flee, I think, in part, in executing the
```

1

2  search the government took Mr. Lichtenstein's passport

3  as well as I think Ms. Morgan's passports, so the

4  ability to flee was at least delayed once the search was

5  executed.  Whether they were trying to obtain, you know,

6  foreign passports or false passports as that file found

7  on Mr. Lichtenstein's electronic materials indicates,

8  that would take time.  So I think to say, Your Honor,

9  that this is just a continuation of what has been going

10 on is completely untrue given the evidence that's been

11 discovered in the past week, to be honest.

12         THE COURT:  You also say that there's no

13 indication that defendants have contacts here, they're

14 likely to flee somewhere else, what of defense counsel's

15 argument that defendants grew up in this country, have

16 family in this country and so on? Obviously, if they

17 were to flee somewhere where they have family in

18 Illinois, that's not exactly --

19         MS. LYNAUGH:  Your Honor, based on defense's

20 representation, we agree they have contacts in the

21 country but not necessarily where the cases are ongoing

22 in New York or the District of Columbia.

23         THE COURT:  It's not like a case though where

24 someone's sole family contact and so on or in another

25 country, it's not hard to bring somebody back from

33

1  Illinois.

2

3       MS. LYNAUGH:  No, but, Your Honor, you know,

4  Mr. Lichtenstein is a dual Russian citizen, right, and

5  there is no bilateral extradition treaty with Russia.

6  So were Mr. Lichtenstein to head to Russia --

7       THE COURT:  What are the circumstances, as you

8  understand it, of him gaining citizenship here?  Did he

9  receive asylum here?

10      MS. LYNAUGH:  It's unclear, all we know is that

11 he, the date that he gained citizenship in 2002.

12      THE COURT:  Did he, in fact, obtain asylum

13 here?

14      MR. BANSAL:  Judge, the defendant came here

15 when he was six so he doesn't know so he's not sure, but

16 he does, he does firmly remember that they came as

17 refugees, religious refugees. So I don't know if they

18 were granted political asylum.  Obviously, the only

19 reason that you would have to be is if your other, your

20 immigration status was such that you were going to be

21 returned so --

22      THE COURT:  I'm only asking because there's a

23 statement by Ms. Morgan apparently to Pretrial that her

24 husband became a US citizen as a political refugee.

25      MR. BANSAL:  Yeah, I don't know, obviously,

```
 1                                                34
 2   she's not a lawyer, I don't know how, like what the
 3   legal ins and outs of that are, but I can find out if
 4   that's relevant, Judge. I do think that the most
 5   important thing, Judge, is that I think the government
 6   is painting him out to be somebody who kind of has two
 7   homes or something --
 8            THE COURT:  Why would he have a Russian
 9   passport?
10            MR. BANSAL:  So I'm going to just verify one
11   thing, Judge.  Judge, he was born there and, you know --
12            THE COURT:  I'm sorry?
13            MR. BANSAL:  He was born there and Russia
14   allows dual citizenship, I don't think it speaks to
15   anything, he hasn't, there's no -- give me one second,
16   Judge.  He's never traveled there --
17            THE COURT:  What's that?
18            MR. BANSAL:  He's never traveled there, that's
19   all I wanted to verify. He never has traveled there so
20   it's not as if he, you know, he's had it, again, he's
21   had US citizenship since when he came here when he was
22   six, his parents --
23            THE COURT:  You have to renew a passport
24   through, right, he's not, he doesn't have a passport
25   that shows a picture of himself as a six year old --
```

```
 1                                                35
 2              MR. BANSAL:  Let me see, Judge, in Russia I
 3   don't know, let's see, give me one second.
 4              MS. LYNAUGH:  Your Honor, my understanding is
 5   that his Russian passport expires in 2029.
 6              THE COURT:  Do you have a copy of it? I mean do
 7   you have the passport that's been surrendered?
 8              MS. LYNAUGH:  The government is in possession
 9   of the passport, I do not have a copy of it here.
10              THE COURT:  What was its date of issuance?
11              MS. LYNAUGH:  2019.
12              MR. BANSAL:  Judge, he was, it's really only
13   because he was born there and if he ever intended to
14   return to his homeland this would be something that
15   would be important, and it's not something that can
16   probably easily be gotten in the first instance. But
17   he's never traveled there and I just think, you know,
18   for the government to paint it -- first of all, they
19   have it, right?  They have his Russian passport. So
20   whether or not it evinces any ability or intention to
21   travel to Russia is somewhat irrelevant at this point
22   considering that the government has the passport,
23   they'll keep it. I'm sure there will be all kinds of
24   notices to make sure that they don't travel.
25              THE COURT:  Has the government shared with you
```

```
 1                                                    36
 2   the contents of this file found that it said was titled
 3   passport ideas?
 4          MR. BANSAL:  Yeah, so I have what I have in the
 5   affidavit, I have what everybody else has. But as far
 6   as, those are not passport pictures of the defendants --
 7          THE COURT:  I'm sorry, what you have in which
 8   affidavit?
 9          MR. BANSAL:  The complaint affidavit, right,
10   the one that's attached to the complaint. So I guess
11   what I'm saying is I only know what the Court knows.
12          THE COURT:  What paragraphs of that complaint,
13   counsel, relate to that file?
14          MS. LYNAUGH:  Paragraph 54, Your Honor, on page
15   18.
16          THE COURT:  That's all you know is from what's
17   in paragraph 54?
18          MS. LYNAUGH:  I'm sorry, I couldn't hear you.
19          THE COURT:  All you know about this is what's
20   in paragraph 54 that the prosecutors in DC put together?
21          MS. LYNAUGH:  I mean in consultation with
22   counsel from Main Justice I can get more information if
23   Your Honor would like.
24          THE COURT:  I mean does it look like there were
25   attempts to obtain another passport or is it just
```

                                                            37

1

2  pulling together some links?

3          MS. LYNAUGH:  Your Honor, the passport file

4  pulls together information about how on the dark net to

5  obtain passports.  In consulting with the agents, it

6  seems that one of the vendors that was identified in

7  that document was used to obtain identification, used in

8  other accounts associated with the conspiracy, not a

9  passport but other identification documents.  So whether

10 there has been a specific attempt to obtain a passport,

11 we don't know, but we do know that there is a file

12 pulling together resources on how to obtain one.

13         THE COURT:  Counsel, do you want to address any

14 of defense counsel's comments about the strength of the

15 allegations, particularly with respect to Ms. Morgan?

16         MS. LYNAUGH:  As to the strength of the

17 allegations?  I mean, Your Honor, you know --

18         THE COURT:  You started off your argument by

19 saying the case against both defendants was extremely

20 strong and defense counsel has indicated he thinks he's

21 got a motion to dismiss the charges against at least Ms.

22 Morgan.

23         MS. LYNAUGH:  I am new to this case in that I

24 am not the agent who, one of the attorneys who

25 investigated it, but I read this complaint in the last

1                                                              38

2      few days and I was, frankly, overwhelmed by the amount

3      of detail that's included in here.  To call this

4      complaint conclusory is so, you know, is anything but

5      what it is. It contains, you know, detailed, painstaking

6      detail about how this money was taken from, you know,

7      was originally stolen in 2016, how it flowed through

8      different exchanges, how it flowed into different

9      accounts.  I mean money doesn't accidentally end up in

10     12 different accounts that you own, right, connected to

11     a single hack. I thought this complaint was

12     extraordinarily detailed and, and traces the money in

13     ways that are completely compelling and convincing.

14            And I thought that was true with respect to

15     both Mr. Lichtenstein and Ms. Morgan, right? Ms. Morgan,

16     there's at least six bank accounts that the government

17     has identified that contain bitcoin in it, you know, or

18     contain funds in it traceable to the hack. Ms. Morgan,

19     you know, it was equally her apartment that was

20     searched, it was equally her apartment that had a

21     plastic baggie under the bed labeled burner phones. The

22     personas that Mr. Lichtenstein, were found in Mr.

23     Lichtenstein's electronic accounts, they were men and

24     women.

25            THE COURT:  What is the connection between

```
 1                                              39
 2  burner phones and likelihood of flight?
 3          MS. LYNAUGH:  You know, it's just a
 4  sophistication in dealing with electronics and a
 5  sophistication in being undetected, right?  A burner
 6  phone is a way to communicate without having your
 7  communications detected.
 8          THE COURT:  Counsel, do you want to address any
 9  of these additional points?
10          MR. BANSAL:  You can intercept the burner
11  phone, you can locate a burner phone, I did it all the
12  time when I was sitting over there because I don't
13  really think that goes anywhere.  Judge, I do have a few
14  things to respond to my colleague on.
15          You know, I think that the Court asked some
16  questions about the strength of the proof against Ms.
17  Morgan and I heard something that didn't really speak a
18  lot about the evidence, they just said that the
19  prosecutor's view is that this is a very strong
20  affidavit. You know, and she said that she didn't see
21  anything conclusory about it.  I just wanted to point
22  out one thing, Judge, paragraph 7 of the complaint at
23  page 3, so all of the accounts that are associated with
24  Ms. Morgan are below the line that says fifth, right?
25  So those accounts that the government is associating
```

1                                                            40

2  with Ms. Morgan are in sub paragraph E there, okay, and

3  the accounts above it are the ones that they're

4  associating with the hack.  In paragraph D, it says --

5          THE COURT:  I'm sorry -- okay, go ahead.

6          MR. BANSAL:  Right, in paragraph D which

7  traces, and the prosecutors made a lot about how

8  meticulously the agents traced these funds from the hack

9  to accounts that were controlled by Ms. Morgan. It all

10 goes through this paragraph D which says, "to various

11 unhosted bitcoin wallets," that's the meticulous detail

12 that is used to trace the hack proceeds to accounts that

13 are associated with Ms. Morgan. So I just don't think I

14 heard anything that gives me any confidence, maybe it

15 gives me less confidence, in the proof against Ms.

16 Morgan.

17         I also found unpersuasive, and I say this with

18 due respect, I know it's not the Office's case, but I

19 found unpersuasive the notion that there really has been

20 a change, because the prosecutor said before the change

21 is that they seized a billion or $3 billion, which I

22 believe I heard demonstrates in the prosecutor's view

23 that it is now abundantly clear that the clients have

24 access to a lot of money, that's and entirely

25 contradictory sentence, they seized it, nobody has

41

1
2   access to it, as I said, besides the Treasury.

3          I also don't find persuasive the notion that,
4   well, my clients were sitting around sort of thinking
5   that, well, you know, the FBI, and they used other
6   people to decrypt this stuff, could just, you know, not,
7   not ever find any of this stuff. I think the Court's
8   inference or I think the inference I think the Court was
9   going to is the correct one which is that they knew from
10  January 6th onward that all of this information was
11  within the grasp of the government.

12         And I'd just close by saying that the notion
13  that they could be applying for passports or they have
14  access to something is just, it's complete speculation,
15  you could say it about anybody, you could say it about
16  me, and it isn't a basis on which to hold someone in
17  pending an appearance in another district when they
18  could go down there by train, which they would have done
19  if I had gotten a call yesterday instead of this
20  morning.

21         THE COURT:  Is there a date in DC for an
22  appearance?

23         MS. LYNAUGH:  A date in DC, there is not, Your
24  Honor.

25         THE COURT:  I just want to make one point here

1                                                          42

2   which is that I'm charged with looking at each defendant

3   individually, and it is not necessarily the case that a

4   decision as to one should follow a decision as to the

5   other.  They are not entirely similarly situated.  I'll

6   also note that Pretrial Services is recommending

7   detention for both based on an assessment of factors

8   that are relevant to flight risk.

9           All right, so here's what I'm thinking, with

10  respect to flight which is the sole basis for the

11  government's argument, the standard is only

12  preponderance, so it's not that hard for the government

13  to show flight risk compared to the standard for showing

14  danger to the community.  It's still hard for me to know

15  at this point how strong the evidence is or how strong

16  the allegations are because it is a complicated matter,

17  but I think it's clear that defendants, or it at least

18  clear defendants have means, that the charges are,

19  indeed, serious, and that they have both traveled a fair

20  amount internationally. And I am also troubled by the

21  government's proffer about files that were found, was

22  this Mr. Lichtenstein's account?

23           MS. LYNAUGH:  Yes, his cloud based account.

24           THE COURT:  His cloud based account, regarding

25  ways to obtain unlawful passports, at least that's what

1
2  the government is suggesting.  And with respect to other

3  identifying information of other people which could be

4  used in connection with obtaining falsified travel

5  documents.

6        MR. BANSAL:  I apologize, Your Honor, I would

7  never interrupt but I just want to make sure I put one

8  thing on your radar.

9        THE COURT:  Sure, go ahead.

10       MR. BANSAL:  As I heard the government framing

11  the relevance of those websites and the files in the

12  cloud, were that they were part of the money laundering

13  conspiracy, that they were a way to get money out of

14  bank accounts that were being set up. That's what I

15  heard.  Nowhere did I hear that they were used to obtain

16  false travel documents, which is what --

17       THE COURT:  Well hold on a second, the

18  government did say, correct me if I'm wrong, there was a

19  file that seemed to have links to how to obtain a

20  passport, presumably not an official passport if you are

21  going through some sort of dark web website as opposed

22  to official government sources. If you're going to

23  obtain a passport from somewhere, it's not a far leap to

24  think that you might try to use someone else's identity

25  and the government also said that there was a file that

1                                                           44

2   had information with biographical information and so on

3   about other, that had other people's identities, this

4   file called persona, which might have been used for a

5   different purpose but it is at least suggestive of the

6   ability to think about obtaining a passport that's a

7   false passport perhaps with a false identity.

8           MR. BANSAL:  I think that ability has existed

9   straight through from the last month --

10          THE COURT:  That may be.  That may be --

11          MR. BANSAL:  One more thing, Judge, I'm sorry,

12  I'm -- sorry, Judge, I don't want to --

13          THE COURT:  Just hold on a second, okay, and

14  I'll let everybody, I mean I'll let everybody speak

15  their piece. So those are things that, perhaps

16  particularly for Mr. Lichtenstein, but those are things

17  that weigh in favor of detention.

18          On the other side of that equation, the fact

19  that defendants have, as counsel put it, stayed put,

20  since at least, well, since being aware of the

21  investigation since at least November, even after search

22  warrants were executed in more than one location, and

23  even after they knew specifically through counsel of the

24  nature of this investigation and the alleged seriousness

25  of the investigation and the allegation the government

45

1

2    was looking into their theft of millions of dollars is a

3    strong factor that counsels in favor of allowing them to

4    report on their own. If they have not left yet, what is

5    so different that would make them leave now.

6         I find it a little bit thin for the government

7    to say, well, they didn't know we would really get into

8    the encrypted files, and now that they know we could get

9    into the encrypted files, now they are differently

10   motivated. You were clearly investigating them for these

11   crimes.  You were clearly very determined in

12   investigating them for these files. You clearly were

13   obtaining information and documents in connection with

14   that for a period of months and if they have all of

15   these means and desire to flee, I find it difficult to

16   believe it would take that long for them to obtain false

17   passports or anything else or for them, before their

18   passports, I don't know, when were the passports seized?

19         MS. LYNAUGH:  January 5th.

20         THE COURT:  In January, okay, so they were

21   aware since November.  So before January they had their

22   passports, they didn't even have to get other passports

23   and they had lots of ability to go other places, to me

24   that is a fairly compelling argument that they don't

25   pose such a strong flight risk that conditions can't be

1                                                          46
2   set.

3          So some of the other arguments, like I said,
4   I'm not quite sure what to make of it in terms of the
5   strength of the evidence and the allegations and so on.
6   But if you know you're being investigated by the
7   government, if you have counsel who is talking to you
8   who is very familiar with all of the tools that the
9   government has at its disposal, you still have your
10  passports, you have the means to go somewhere, you
11  don't, and then you don't again after the searches, and
12  then you don't -- first search, and then you don't again
13  after the second search, that does argue in favor of
14  maybe they're not actually going somewhere.

15         I'm wondering, as I said, first of all, whether
16  these defendants should be treated the same way with
17  respect to detention or release, I think the case is
18  somewhat stronger against Mr. Lichtenstein and there are
19  some other factors that might keep Ms. Morgan around,
20  especially if she has some upcoming doctors'
21  appointments that are important to her that she may not
22  want to miss. I'm wondering if some conditions can be,
23  can be crafted that would allow them to be monitored,
24  you know, perhaps GPS monitoring, should they go
25  somewhere, should they go within a certain distance of

```
1                                              47
2   an airport you would immediately know about that, for
3   example.  I'm just wondering, especially with respect to
4   Ms. Morgan, whether it may be possible to set conditions
5   before they get to DC and then when they get to DC the
6   judge does what the judge does, one way or the other,
7   with both of them.  Thoughts?
8           MS. LYNAUGH:  I mean, Your Honor, it's
9   obviously our view that there aren't conditions that can
10  be set.  Location monitoring, you know, location
11  monitoring is great at telling you when someone has
12  fled, but doesn't necessarily, isn't necessarily as good
13  at telling you when someone is about to flee. In recent
14  history in this office, you know, I know of at least two
15  cases in which a defendant has cut an ankle bracelet and
16  fled so I'm not sure, given the incentives in this case,
17  the potential punishment they're facing, the
18  international ties, that something like location
19  monitoring would be sufficient.
20          THE COURT:  Counsel.
21          MR. BANSAL:  If the Court needs a response,
22  Judge, I mean whenever the government cites the fact
23  that in isolated cases ankle monitors have been cut,
24  they don't cite the thousands of cases where it works
25  and secures the appearance of the defendants in court.
```

1                                                          48
2    It does work, otherwise Pretrial Services wouldn't use
3    it.
4              THE COURT:  Let me address Ms. Morgan's case.
5    Her parents are here you said?
6              MR. BANSAL:  Yes, Your Honor, right here,
7    second row.
8              THE COURT:  Let me ask, let me ask the parents,
9    would you be prepared to take some responsibility for
10   making sure that your daughter returns to court when she
11   is supposed to?
12             DEFENDANT MORGAN'S MOTHER:  Yes.
13             DEFENDANT MORGAN'S FATHER:  Yes.
14             THE COURT:  Do you own property?
15             DEFENDANT MORGAN'S FATHER:  Yes.
16             THE COURT:  Do you own your own home?
17             DEFENDANT MORGAN'S FATHER:  Would you be
18   willing to post your own home as security for her return
19   to court such that it could be forfeited to the
20   government if she were to flee?
21             DEFENDANT MORGAN'S FATHER:  I don't know how
22   that works but, yes, we would.
23             THE COURT:  Basically what would happen is the
24   government would have the right to seize your property,
25   your home, if she did not appear in court.  Do you own

1                                            49

2   more than one home?

3           DEFENDANT MORGAN'S FATHER:  Nope.

4           THE COURT:  And how long have you lived in the

5   home you live in?

6           DEFENDANT MORGAN'S MOTHER:  About 1997, I

7   believe.

8           THE COURT:  Where do you live?

9           DEFENDANT MORGAN'S MOTHER:  Northern

10  California?

11          THE COURT:  You flew in today for this?

12          DEFENDANT MORGAN'S MOTHER:  No, we were here

13  because my daughter had surgery last week, so we were

14  here.

15          THE COURT:  I see.  Counsel, what about a

16  package that would, for Ms. Morgan that would have her

17  parents posting her property as security?

18          MR. BANSAL:  We'd agree to it, Judge.

19          THE COURT:  If defendants have money, then

20  simply having a bond, if someone, if she flees the money

21  might not be that big of an issue for them if they have

22  lots, I don't know how wealthy they are but if they have

23  lots of money it may not be an issue. But if there's

24  someone who defendant cares about who might suffer a

25  loss that's meaningful to them, that might be greater

1                                                          50

2 incentive.  Counsel, what would you think of that for

3 assurance of Ms. Morgan's return to court, at least to

4 get her to DC?

5          MS. LYNAUGH:  We would still ask for detention,

6 Your Honor.  As Your Honor points out, they, we believe

7 they have access to the remaining $330 million in

8 bitcoin and so that's a lot of money to potentially buy

9 a new house.

10          THE COURT:  When you were proposing cosigners,

11 how many were you proposing and who were they?

12          MR. BANSAL:  So it would be at least two, it

13 could more, Judge, if the Court needed them.

14          THE COURT:  The two parents or were there

15 others?

16          MR. BANSAL:  It would be the parents. And, by

17 the way, Mr. Lichtenstein's parents, they live in

18 Illinois, they weren't here, again, this is, Ms.

19 Morgan's parents were here because of the surgery. If

20 they were standing here, they would say exactly the same

21 thing, they would say that they would post their house -

22 -

23          THE COURT:  Have you spoken to them about that?

24          MR. BANSAL:  We spoke to them beforehand and

25 they, and they know what it involves. They also only own

1                                                          51
2   one home, they also are folks of modest means to whom
3   this would be catastrophic to lose the kind of money
4   that goes into a Southern District bond, and the moral
5   suasion that that would hold over Mr. Lichtenstein would
6   be equal.

7           THE COURT:  If there were a bond in this case
8   it would have to be quite high.

9           MR. BANSAL:  That's understood, Judge.  I had,
10  and the reason I'm so sort of, I don't mean to sort of
11  take that so much in stride but the reason that I do,
12  Judge, is because I don't have any doubt, right, these
13  people had me on their cell phone, they call, we speak
14  to them every day, we meet in our offices, we've been
15  talking about this case since we were retained in
16  January. I was shocked at what happened this morning and
17  even more so about wanting to hold them in. I have zero
18  doubt that they're going to appear.

19          THE COURT:  I'm going to disclose for the sake
20  of the record that I got a call in chambers, I was the
21  only one in chambers so I answered my own phone, from
22  defense counsel asking for, looking for my deputy to try
23  to find out how to bring cell phones in to this
24  proceeding. And he didn't say anything substantive about
25  this case other than that he was surprised that they

1                                                          52

2   were arrested. So considering he's saying that here, I'm

3   going to put on the record that he told me that

4   separately as well, but that is not factoring into this

5   analysis, I just wanted to make that small bit of an ex

6   parte communication clear. And he did not, I'm sure,

7   intend to speak with me.

8            MS. LYNAUGH:  Understood, Your Honor.

9            THE COURT:  Although he was surprised they were

10  arrested, he was more than surprised that I answered the

11  phone.  All right, if I were to set a bond,

12  understanding that the government is seeking detention

13  in this case and it is not their position that I should

14  be setting a bond, but if I were to do so, nonetheless,

15  I would want to hear from both parties as to an

16  appropriate amount of a bond.

17           MS. LYNAUGH:  Apologies, Your Honor, the DC US

18  Attorney's Office, it is not their practice to ask for

19  monetary bonds, it is not the custom in that district

20  and so they would not ask for a monetary bond in this

21  case. What they would ask is if you're not going to

22  detain the defendants, that you stay your decision for

23  24 hours so that they can appeal to the DC bench.

24           THE COURT:  I don't know that that would be

25  necessary because I would require all conditions to be

1                                                           53

2  satisfied before release. And if I require these homes

3  to be posted as security, that's not happening quite

4  that fast.

5          MS. LYNAUGH:  Understood, yes.

6          THE COURT:  Okay?  What is their practice to

7  require as conditions when conditions are set?  And, by

8  the way, just because they do something doesn't mean we

9  have to do the same thing here, again, there are two

10 different judges doing two different things perhaps.

11         MS. LYNAUGH:  Correct, Your Honor, it just

12 impacts what I request of the Court.  Their practice in

13 cases where there is not a bond is to ask for

14 conditions, for example, home detention, electronic

15 monitoring, no use of device, devices with any

16 connection to the internet, no opening of any new

17 financial accounts, no engaging in any cryptocurrency

18 transactions.

19         THE COURT:  All right, if I set conditions

20 here, I am certainly going to set strict conditions and

21 I'm going to require that all conditions be satisfied

22 before release. And if it turns out that it takes so

23 long to satisfy conditions and they should be appearing,

24 then they ought to be removed instead of just sitting

25 around waiting to see if they can satisfy conditions,

1

2 right?

3          MR. BANSAL:  Judges, Ms. Morgan has an oral

4 surgeon's appointment tomorrow, again, to deal with that

5 issue where she has nerve damage and, honestly, you

6 know, I'm, the idea that --

7          THE COURT:  I'm not going to release them on

8 their own signature or something tonight, I'm not going

9 to do that.

10          MR. BANSAL:  Well Ms. Morgan's parents are

11 here, so whatever has to be done can be done tonight and

12 --

13          THE COURT:  I'm not going to release them

14 without strict conditions, I'm not even going to

15 consider releasing without strict conditions.

16          MR. BANSAL:  The only thing, I was just

17 suggesting those conditions can be imposed and satisfied

18 this evening --

19          THE COURT:  I don't think security, I don't

20 think the posting of homes can be done this evening.

21          MR. BANSAL:  Judge, I mean you could impose a

22 very high bond that would give the government a lien

23 over all their property if it were, if she happened to

24 flee. And, you know, we were talking, I won't tell you

25 anything privileged but I was waiting to hear what the

55

1
2  government said about like the amount of the bond and I
3  was thinking whatever they say I'm just going to say yes
4  because it's not relevant because they're not going to
5  flee. But if you want to put a very high bond that would
6  result in an incredibly onerous lien automatically, and
7  that's what happens, if she were to flee, over all their
8  property, it would act posting their house as security,
9  it's no difference.
10         THE COURT:  I disagree with that and I'm not
11  going to order release this evening. So I understand
12  that your client has some medical issues but I am
13  finding in your client's favor that conditions can be
14  set which is something that on a close call with a not
15  that difficult standard could very well could have gone
16  and could go the other way on that point, okay?  So I'm
17  going to set a bond because that's what we tend to do
18  here, all right?  So in light of that, and with the
19  government's understanding in this court and what we
20  typically do here, do you want to suggest a bond amount?
21         MS. LYNAUGH:  A hundred million dollars, Your
22  Honor.
23         THE COURT:  Do you have a comment on that?
24         MR. BANSAL:  I've never heard that, I've never
25  heard that sum uttered in this courtroom in 22 years,

56

but fine.

THE COURT:  Well, it does sound a bit much.

MS. LYNAUGH:  Your Honor --

THE COURT:  Also, when you have a bond like
that, the next thing the government may say is that none
of the cosigners are qualified as financially
responsible to deal with that kind of bond.  Do you have
any idea, do you have any idea what the equity is worth
in the parents' home?

MR. BANSAL:  I can find out, Judge, but I'm
confident it's not $100 million and that's why it's just
a, that's why it's a laughable thing to have said. And,
by the way, all this is coming from Washington.

THE COURT:  What suggestion do you have?

MR. BANSAL:  I mean a million dollar bond would
do it, Judge, it would bankrupt them just as much as
$100 million.  All this is just coming from DC.

MS. LYNAUGH:  Your Honor, let me just point out
that Mr. Lichtenstein, I believe in the Pretrial Report,
has an account, has a single account with $2.4 million
in it.

MR. BANSAL:  We're not talking about, we're
talking about the cosigners.  They're so confident that
he's going to us it to flee, I don't see them seizing

57

1   anything.

2           THE COURT:  I'm going to do these separately,

3   they don't have to be the same, they shouldn't be the

4   same.  For Mr. Lichtenstein, $5 million bond, parents'

5   home posted as security for the bond, five cosigners.

6   Home detention with electronic monitoring.  Actually,

7   I'm not sure why home detention as opposed to home

8   incarceration, where would he need to go?

9           MR. BANSAL:  I don't actually -- sorry, Judge,

10  one second.  If he had medical, I just don't know

11  whether medical appointments would be permitted.

12          THE COURT:  For home incarceration, you can

13  still go to medical right? Home detention is generally

14  if you have a job you're going to on a daily basis.

15          MR. BANSAL:  Yeah, I mean --

16          THE COURT:  Home incarceration with electronic

17  monitoring as deemed appropriate by Pretrial Services to

18  enforce it with strict supervision.

19          MR. BANSAL:  Judge, I'm just thinking and I

20  don't know if Pretrial, shopping, like going grocery

21  shopping, just providing for themselves, I mean his

22  wife's not in any condition to do some of that stuff. I

23  mean with an ankle bracelet, Judge?

24          THE COURT:  He can order in.

25

```
 1                                          58
 2          MR. BANSAL:  All right, Judge.
 3          THE COURT:  Let me ask Pretrial about devices
 4  with connectivity to the internet, that's a condition
 5  you sometimes set, yes?
 6          PRETRIAL SERVICES OFFICER: (off microphone)
 7  Yes, Your Honor, we do do sometimes a home inspection to
 8  see what devices are internet connectable in the
 9  residence (indiscernible).
10          THE COURT:  I would assume there would be a
11  home inspection before release in this case, in general,
12  all right, but you do sometimes set a condition or the
13  Judge sometimes sets a condition that Pretrial can work
14  with that a defendant is not to have devices with
15  internet connectivity?
16          PRETRIAL SERVICES OFFICER:  Yes, Judge.
17          THE COURT:  He could still have email to
18  communicate with counsel?
19          PRETRIAL SERVICES OFFICER:  On a specific
20  device that (indiscernible).
21          THE COURT:  So I could say no internet
22  connectivity except email as installed by Pretrial?
23          PRETRIAL SERVICES OFFICER:  On a specific
24  device with computer monitoring (indiscernible).
25          THE COURT:  Okay.  No engaging in any
```

```
 1                                              59
 2   cryptocurrency transactions. Maybe it goes without
 3   saying if you don't have internet connectivity you can't
 4   do that but I'm going to put it down separately anyway.
 5            PRETRIAL SERVICES OFFICER:  (indiscernible)
 6            THE COURT:  Yes.
 7            MR. BANSAL:  Judge, could I ask a question
 8   about the telephone?  Could he get a flip phone, one, so
 9   he can communicate with us and with his parents, which
10   would be no different than if he were in custody?  Also,
11   could he be allowed, since he can go to doctors'
12   appointments, could he be allowed to come to our office
13   at 32 Old Slip which is very close to where their
14   apartment is?
15            THE COURT:  Does home incarceration allow for
16   exceptions for visits with counsel?
17            PRETRIAL SERVICES OFFICER:  Yes.
18            THE COURT:  And flip phone is pretty standard
19   acceptable, yes?
20            PRETRIAL SERVICES OFFICER: He can have a home
21   phone installed.
22            THE COURT:  He can have a landline, and can he
23   have a flip phone, non-smartphone?
24            PRETRIAL SERVICES OFFICER:  Correct.
25            THE COURT:  All right, so the question I have
```

```
 1                                                          60
 2   is these accounts that are listed in the Pretrial
 3   Services Report, counsel -- counsel?
 4          MR. BANSAL:  Sorry, Judge, I apologize.
 5          THE COURT:  All right, so if he's home, he has
 6   to be able to meet living expenses.  Are these accounts
 7   which show lots of money, are these crypto accounts
 8   where if he cannot engage in any crypto transactions he
 9   can't get his hands on anything or are these like basic
10   cash accounts?
11          MR. BANSAL:  Those would be currency, Judge.
12          THE COURT:  I'm sorry?
13          MR. BANSAL:  Cash, currency.
14          THE COURT:  Okay, so if he cannot engage in any
15   internet transactions or any crypto transactions or
16   whatever, he still has plenty of other access to funds.
17          MR. BANSAL:  Internet transactions I suppose
18   would not include like an online banking transaction,
19   assuming he's going to be like in his home, right?  I'm
20   just wondering --
21          THE COURT:  Well there's a balance there, you
22   don't want him to say, great, I'm taking $2.4 million
23   out today, but on the other hand, you don't want him to
24   be blocked from every resource that he has so he can no
25   longer pay for anything.  So is there, for accounts,
```

61

that's just like a regular bank account, is there a way

to control how much he is taking from these accounts?

            PRETRIAL SERVICES OFFICER:  What we could do is

set a specific amount that could be (indiscernible) each

month. So, for example, they can dispense $10,000 a

month (indiscernible) legal fees, and it has to be

reported to Pretrial.

            THE COURT:  So how would an amount, a logical

amount be set?

            PRETRIAL SERVICES OFFICER: It would be $10,000

a month.

            MR. BANSAL:  That would include legal fees?

            PRETRIAL SERVICES OFFICER:  No.

            MR. BANSAL:  Okay, not including legal fees,

okay.

            THE COURT:  Ten-thousand a month plus legal

fees?

            PRETRIAL SERVICES OFFICER:  Not including legal

fees.

            MR. BANSAL:  It sounds like that would work,

Judge, and if we have a problem we would make an

application, I suppose, and we'll ask --

            THE COURT:  And how would Pretrial know if he

went above that amount?

1                                                          62

2          PRETRIAL SERVICES OFFICER:  They would have to

3   report every expense, expense on that account.

4          THE COURT:  Okay, and how would he get this

5   $10,000 if he doesn't have access to the internet?

6          PRETRIAL SERVICES OFFICER:  From the computer

7   device --

8          THE COURT:  That you would install.  Counsel,

9   you stood up?

10          MS. LYNAUGH:  No, that's fine, Your Honor.

11          THE COURT:  All right.  So for Mr.

12   Lichtenstein, I'm going to summarize, his own signature

13   and that of five cosigners on a $5 million personal

14   recognizance bond with equity in the parents' home

15   posted as security, the full value of the home.  Home

16   incarceration with electronic monitoring, counsel,

17   again, do you need to talk, I want to make sure

18   everybody is focused here?

19          MR. BANSAL:  No, Judge, I was just discussing

20   the terms with Mr. Lichtenstein.

21          THE COURT:  Okay.  Home incarceration with

22   electronic monitoring, strict supervision.  No devices

23   with internet connectivity except he can have email and

24   the ability to access bank accounts only to the extent

25   of $10,000 a month plus legal fees on a specific device

1                                                             63

2   with software installed by Pretrial Services with

3   computer monitoring.  Pretrial Services gets to inspect

4   the home first to see what kind of devices there are,

5   make sure that this can be set up. No engaging in any

6   cryptocurrency transactions, he can have a phone that's

7   not a smartphone, he can have a landline if he wishes.

8           Let me turn to -- oh, and all conditions to be

9   satisfied prior to release.  And I don't think it can

10  happen so lightning fast especially with Pretrial

11  inspecting the premises and all the rest of this, that

12  it would happen within 24 hours. If it could happen so

13  lightning fast that it's within 24 hours I would say,

14  please, don't so as to give the government a chance to

15  appeal, but I just don't think it's realistic to worry

16  about that.

17          For Ms. Lichtenstein, parallel conditions

18  except make it a $3 million bond, same with respect to

19  her parents and their home, same with respect to the

20  cosigners, all the rest of it I think makes sense to

21  have the same.  Slightly reduced bond amount, or not

22  slightly, but in the scheme of things, $3 million

23  instead of $5 million.

24          MR. BANSAL:  Did you say five cosigners for Ms.

25  Morgan, as well?

```
 1                                                      64
 2              THE COURT:  Five cosigners for each.
 3              MR. BANSAL:  May I have just one moment, Judge?
 4   Judge, Ms. Lichtenstein's parents, I mean we'll do
 5   everything we can but to call someone out of the blue
 6   and say can you agree to be beholden to the US
 7   government for $3 million --
 8              THE COURT:  That's a point, that is a point,
 9   that is a very high bond. And I really don't want to set
10   something that is impossible to meet because that's not
11   consistent with the Bail Reform Act.
12              MR. BANSAL:  So for Ms. Morgan could we, her
13   parents are here and I think Your Honor is taking
14   measure of them --
15              THE COURT:  You think five cosigners aren't
16   doable for Mr. Lichtenstein but not for Ms. Morgan?
17              MR. BANSAL:  Honestly, I don't know if they're
18   doable, I've never had five cosigners, Judge, in a case
19   before --
20              THE COURT:  Oh, there have been cases with
21   many, many cosigners.
22              MR. BANSAL:  I've just never personally been
23   involved in one so I, you know, I'm certain we can get
24   three --
25              THE COURT:  Talk to The Federal Defenders. All
```

1                                                    65

2  right --

3            MR. BANSAL:  I'm certain we can get three for

4  Mr. Lichtenstein --

5            THE COURT:  All right, all right, I'm going to

6  make it the parents.

7            MR. BANSAL:  For Ms. Morgan?

8            THE COURT:  Yes.

9            MR. BANSAL:  And for Mr. Lichtenstein, Your

10 Honor?

11           THE COURT:  No, I'm going to stick with five

12 for Mr. Lichtenstein, if it is impossible you'll come

13 back to the Court and explain why.

14           MR. BANSAL:  Thank you, Judge.

15           THE COURT:  Three million dollar bond, two

16 cosigners for Ms. Morgan.  Listen, my initial instinct

17 on this was detention, it was what Pretrial Services

18 recommended, and there's a lot of money at stake here

19 and there's a lot of travel and there's a lot of

20 sophistication, but I am persuaded mainly by the fact

21 defendants have not to this date gone anywhere over the

22 last two, three months, maybe more than that, November,

23 December, January, it's now February.  You must continue

24 not to go anywhere, all right?  I guarantee you, if you

25 do, you will end up being found and be brought back and

1                                                                    66

2   it will be far worse for you. And I can't guarantee what

3   the Judge in DC will do, the Judge in DC may order you

4   detained anyway, that's not in my control.

5          But as far as what I'm saying is, you have to

6   understand, number one, you don't appear, you know, your

7   parents' homes are going to end up potentially being

8   forfeited to the government, right, and you, and whoever

9   cosigns the bond with you, can be responsible for all

10  this money.  This is a fair amount of money.  But just

11  more importantly, in terms of how this goes for you, if

12  the government is proven right that you're going to go

13  now and you go flee now, I've had many dealings with

14  fugitive experts, the Marshal Service, who track people

15  down all over creation and find ways to get them back

16  here. And then it's a whole other ballgame and then you

17  have another crime, the crime of jumping bail. And the

18  crime of jumping bail, especially in a case like this,

19  you know, can be separately prosecuted, it can be

20  separately punished, even if these charges were to be

21  dismissed. Even if your very capable counsel were to be

22  successful in dismissing these particular charges, you

23  could still find yourself in jail for bail jumping, all

24  right?

25          So do not do that, do not prove me wrong, do

1                                                                67

2  not create a situation where come later in the week I'm

3  told now I need to, you know, sign a warrant to get you

4  found and brought back in front of me again. I guarantee

5  you, if that happens you are going to be detained, no

6  thought is going to go into that process, all right?

7  Let me just say this to Ms. Morgan's parents since

8  you're here, hear what I say also, it is extraordinarily

9  important that she appear, because if she doesn't she'll

10  make whatever trouble she's in now far worse, all right?

11           Okay, on the medical front, once conditions are

12  satisfied the home incarceration will allow for medical

13  appointments. But I am going to insist on the conditions

14  being satisfied before release so there will be some

15  delay in that.  With respect to the follow-up on the

16  surgery that Ms. Morgan already had, was there any

17  serious concern there that -- speak through counsel,

18  okay, in the first instance, where if that follow-up is

19  delayed there's actually some significant risk to her

20  wellbeing, was there a biopsy that suggests anything

21  might have been cancerous or anything like that?

22           MR. BANSAL:  Thank goodness, no, not that, Your

23  Honor, but it was surgery that requires follow-up to

24  make sure that there are no complications from it and,

25  you know, there is, I don't want to get too personal but

68

1
2  there has been some pain after the surgery which, you

3  know, hopefully is just normal, but it's important that

4  she get the follow-up to make sure there isn't an

5  infection or something else.

6          THE COURT:  Well, when is the follow-up

7  supposed to be?

8          MR. BANSAL:  It's next Thursday, Your Honor.

9          THE COURT:  All right, well hopefully these

10 conditions can be met by next Thursday.  You know, I

11 also suspect that if there is a slight delay in that it

12 may not be a major crisis and there will be people in

13 the facility, it may not be the best ever, but there are

14 people there who are charged with her physical wellbeing

15 and I'm going to do a medical attention form that

16 indicates that she had surgery, was supposed to have

17 surgery, they should make sure that she doesn't develop

18 some sort of infection and, if so, that she is

19 appropriately treated and seen by a doctor, all right?

20 So if by any chance there's delay, I'll try to indicate

21 that she should be seen. If you get wind of the fact

22 that she's not being seen by a doctor, and that she's

23 running into problems if you communicate with her, she's

24 concerned she has an infection and she is not getting

25 treatment, you let me know, okay?

```
 1                                              69
 2              MR. BANSAL:  Thank you, Judge, I am confident -
 3  -
 4              THE COURT:  All right, I'm going to hand down
 5  to defense counsel, does Mr. Lichtenstein have any
 6  medical issues?
 7              MR. BANSAL:  I didn't hear that, Judge, sorry?
 8              THE COURT:  Does Mr. Lichtenstein have any
 9  medical issues?
10              MR. BANSAL:  Just one second.
11              THE COURT:  Can you give me the address of the
12  two pieces of property?
13              MR. BANSAL: One second, Judge.
14              THE COURT:  Drug testing and treatment for
15  both?  We'll go over it one more time before you leave.
16  And counsel, sorry, Pretrial, mental health?
17              PRETRIAL SERVICES OFFICER:  (indiscernible)
18              THE COURT:  Counsel, I'm going to add a few
19  more conditions here after consultation with Pretrial
20  Services.
21              MR. BANSAL:  Judge, may I hand up a sheet with
22  the --
23              THE COURT:  Make sure it's clear which is
24  which, please, although one's going to be in Illinois
25  and one's going to be in California.  Not bad, now do
```

```
 1                                          70
 2  you spell Tacoma though?
 3          MR. BANSAL:  T-E I was told?
 4          THE COURT:  T-E-H?
 5          MR. BANSAL:  Yeah, T, like Tommy.
 6          THE COURT:  All right, sorry, everybody, for
 7  the delay but give me a moment, I'm putting a lot of
 8  conditions in place which means I have a lot of writing
 9  to do to memorialize that.  But in addition to what I
10  said before, with respect to Mr. Lichtenstein, I'm going
11  to include surrender of all travel documents, you may
12  not apply for a new passport at this time, drug testing
13  and treatment as deemed appropriate by Pretrial
14  Services, mental health evaluation and treatment as
15  deemed appropriate by Pretrial Services. Defendant to
16  pay all or part of the cost of location monitoring as
17  determined by Pretrial Services.
18          With respect to Ms. Morgan, I'm going to
19  include also surrender of any passport, no new
20  applications for a passport.  I'm going to include drug
21  testing and treatment as directed by Pretrial Services.
22  I'm also going to include defendant is to pay for all or
23  part of the cost of location monitoring as determined by
24  Pretrial Services.  And then all of the things that I
25  said before.
```

```
 1                                                         71
 2              THE COURT:  All right, is there anything else
 3   counsel? I'm waiting for some, there we go, Pretrial had
 4   some proposed language and here's what they're
 5   suggesting. For, would this be for each of the
 6   defendants separately?  I'm sorry?
 7              PRETRIAL SERVICES OFFICER:  Yes.
 8              THE COURT:  All right, for each defendant,
 9   defendant not to dissipate or move any assets greater
10   than $10,000 per month except that this cap can be
11   exceeded with Pretrial approval. There's a carve out for
12   legal fees for which the defendant can send, can spend.
13   Do you want to have a specific amount, can spend up to
14   $500,000 per month in legal fees.  Accounts to dispense
15   must be reported -- amounts, I'm sorry, amounts or
16   accounts?  Accounts to dispense must be reported to
17   Pretrial Services. So it must be reported which accounts
18   are dispensing the funds.  Try not to charge them quite
19   that much, counsel.
20              All right, is there anything else other than my
21   filling out the paperwork?
22              MS. LYNAUGH:  Nothing, Your Honor.
23              MR. BANSAL:  No, thank you, Your Honor.
24              THE COURT:  All right, be aware to both
25   defendants that it's likely that the government is going
```

1                                                           72

2  to appeal this and all this time I spent figuring out

3  all these conditions, it may go up in smoke, it is what

4  it is in DC, but perhaps they'll do something similar,

5  you never know.

6           All right, take care, everybody, be well.

7           MR. BANSAL:  Take care, Your Honor.

8           MS. LYNAUGH:  Thank you, Your Honor, have a

9  good evening.

10              (Whereupon the matter is adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        73

1

2                              C E R T I F I C A T E

3

4           I, Carole Ludwig, certify that the foregoing

5    transcript of proceedings in the United States District

6    Court, Southern District of New York, United States of

7    America versus  Ilya Lichtenstein, Docket #22mag1279,

8    and Heather R. Morgan, Docket #22mag1280, was prepared

9    using PC-based transcription software and is a true and

10   accurate record of the proceedings.

11

12

13   Signature_____
                              *Carole Ludwig*

14                       Carole Ludwig

15   Date:  February 10, 2022

16

17

18

19

20

21

22

23

24

25